We'll hear argument first this morning, Case 09-525, Janus Capital Group v. First Derivative Traders. Mr. Perry? Mr. Chief Justice, and may it please the Court, affirming the judgment below would authorize private securities fraud class actions against every service provider that participates in the drafting of a public company's prospectus. It is therefore nothing less than a frontal assault on this Court's decisions in Central Bank and Stone Ridge. In those cases, Your Honors, this Court held that service providers may not be sued primarily in private class actions and left that matter for Congress to resolve. And Congress did respond not once, not twice, but three times to those decisions. First, in the PSLRA, the Congress authorized a Federal action, a government action, only against aiders and abettors, leaving the question of private class actions for this Court's resolution. Sotomayor, who is the violator alleged here? Not in the complaint, but in the briefs. As I read the briefs, they claim that Janus itself did not make the false statement, that the two appellants did, that they are the actual speakers because they were talking about their activities and they used Janus as a conduit to deceive the market. That's, I think, what they are alleging. Justice Sotomayor, the challenge statements appear in the prospectuses for the Janus funds, separate legal entities, not parties to this law. So how do we sustain the intermediary cases when the company, through market analysts, divulges misleading statements? We don't talk about the market analyst's falsity. We talk about the company's falsity, because the market analyst didn't have C enter. Your Honor, the company or, excuse me, the conduit or analyst cases fall under two categories, neither of which is met here. First, they are a scheme between the company, orchestrated by the company to distribute its information through the analyst to the market, and they are brought under 10b-5a as scheme cases. That is most of the analyst cases. There is no 10b-5a claim in this case. This is only a 10b-5b making claim. Second, those few cases, the analyst cases that are brought under b, involve an omission. That is, the company has failed to correct a statement made by an analyst where there is a duty to do so. There is no omission claim in this case, because there is no duty. Sotomayor, but what's the difference between an omission or a commission? If a company purposely divulges a falsehood to an analyst, knowing it's going to be distributed until, so who's making the false statement, the analyst or the company? Your Honor, the company makes the statement to the market. Under Basic, the analyst is the market. It is the ears of the market that takes the lead. So why isn't the two appellants on their theory? We can talk about whether the complaint does or does not adequately allege their theory. That's a different issue. I accept that. But under their theory, why isn't the appellant's, the primary violator, not even a secondary? Because they claim, I think, and I'm going to find out from them, that Janus had no scienter, that it didn't make the false statements, that all of this was done in secret by the appellants, so they were the only violator. Your Honor, the analyst cases, the issuer speaks to the market directly. Here, there is an intervening legal entity, the Janus Funds. Scienter or no scienter, that is a separate corporation. Sotomayor, do you mean to say to me that puppets become a legal defense for someone who intentionally manipulates the market information? Justice Sotomayor, the Congress has drafted two statutes that deal with puppets. Section 20B, which these plaintiffs have not invoked, makes it unlawful for one party to do indirectly what it would not be permitted to do directly. That's the puppet statute, the ventriloquist dummy statute. That's the controlled person statute? No. There is also 20A, which is the controlled person statute, also not invoked by these plaintiffs. Those are forms of secondary liability, Your Honor. In fact, the Court's questions go to the distinction between primary and secondary liability. Sotomayor, but if Janus had no scienter, if its board of directors did not know that the statements were false, they had no way of knowing, because as I understand the complaint, and this is alleged, the deal was secret. So Janus itself would not be a primary violator. Who is? Justice Sotomayor, our position is nobody had scienter, and every adjudicator to look at these facts, Judge Motts in the district court, the ALJ of the SEC, has found that there was no scienter anywhere up and down the line. So the fact that somebody didn't have scienter doesn't answer the problem here.  And no market timer is investing in this, in these Janus funds. Somebody made the decision that certain hedge funds would be allowed to engage in that activity. Who was that somebody? The advisor personnel made the determination, Justice Ginsburg, that the policy was discretionary, that when it said we may refuse trades, the funds may refuse trades, that there are. So the statement that's alleged to have been the conduct that is alleged to have been in opposition to the announced policy, that is attributable squarely to, which you, this is an entity called JCM. That's correct, Your Honor. So it made the decision that violated the policy. That's correct, Your Honor. Nonetheless, it's not a primary actor. Not as to these plaintiffs, Your Honor. But can we discuss the case, and perhaps you don't think so, can we discuss this case, must we not discuss this case, on the theory that JCM's scienter, JCM's knowledge of a false statement is a given in the case? Now, maybe you'll be able to prove otherwise. You say that they're not liable anyway. Justice Kennedy, you're exactly right. That is the theory pleaded in the complaint. And it seems to me that's what the argument here is mostly about. And the question that is before this Court we would submit is whether scienter or no scienter, JCM can be held liable for the statements in another company's prospectus. This Court has never held liable. Even though there was no scheme with another actor, even though it was the only violator, which is a fair reading of the complaint. They chose not to bring a scheme case. And remember, there is a second set of investors here. The fund investors, the SEC brought an action, secured $100 million on behalf of them. There was a series of private litigation that has been resolved, brought by those investors. These investors did not purchase the securities offered by the prospectus they challenged. And again, there's a fundamental disconnect between the defendant in the case and the challenge, Mr. Kagan. Once again, if the complainant's in the case, the plaintiff's in the case, hypothetical case, not this case, hypothetical case, were injured shareholders in the fund, I take it you say still they could not sue JCM? No, Your Honor, for different reasons. They can sue JCM for an omission because there's a duty that runs from JCM to the funds. That was the theory advanced in that separate lawsuit accepted by the district court, which has since been resolved. They can't – these plaintiffs can't bring an omission case because there's no duty that runs from JCM out to the JCG shareholders. The district court held that. They didn't appeal that to the Fourth Circuit. They didn't present that in their cert petition. So they can't bring that omissions case. Any wrongdoing in this case, Justice Ginsburg, to finish my answer to your question, the policy says funds are not intended for market timing. The advisor allowed 12 traders to trade frequently. The only wrongdoing, if there is any wrongdoing, was the failure of the advisor to disclose to the trustees the deviation from the policy. That is a State law breach of contract. It may be a breach of fiduciary duty. Kagan. Mr. Perry, who wrote the relevant statements? Perry, who wrote the relevant statements? Your Honor, the funds made the statements to the public. They were drafted. I understand that they were in the funds prospectus, but who wrote them? They were drafted by lawyers for the funds, lawyers representing the funds. Who paid those lawyers? The advisor paid the lawyers. So JCM paid the lawyers. Correct, Your Honor. And so it was JCM's lawyers who wrote the prospectus, including the relevant statements here, the asserted misrepresentations. I disagree with that, Justice Kagan. They don't allege that in the complaint, and the facts show that the lawyers wouldn't. But suppose the complaint had alleged that. Suppose the complaint had simply said JCM's lawyers authored the relevant statements in the prospectus. One would have to. Would that be enough to survive a motion to dismiss? No, Your Honor. One would have to further look at who those lawyers were representing. The truth in the real world is every prospectus is written by lawyers, Justice Kagan. Lawyers write prospectuses. These are in-house counsel for the investment advisor. In-house counsel, outside counsel, once they draft materials and present them to their client, it becomes the client's statement when adopted by the client. The board of trustees of the funds has to review every policy, is responsible for every policy, drafted by inside counsel, outside counsel, consultants. It's not unusual for companies to retain outside service providers to provide any number of policies, employment policies, investment policies. Ginsburg-McCarran, Jr. Mr. Perry, you said that it was the funds' lawyers who drafted the prospective. But in fact, it was JCM's lawyers. The lawyers, they were in-house lawyers for JCM. And they served the funds in doing this prospectus, but they were on the payroll of JCM and they were JCM's legal department. Your Honor, like all lawyers, they wear multiple hats. I represent multiple clients. These lawyers represent multiple clients. Ginsburg-McCarran, Jr. I thought they were in-house lawyers. They are in-house lawyers at JCM, but they also represent the funds. And the SEC has specifically recognized in the context of investment companies that where an advisor counsel is representing the funds, his client or her client for those purposes is the funds.  purposes. Kennedy, let's say that JCM's principal officers and managers wrote the statement. You still say there's no lie. Absolutely, Justice Kennedy, because when the statement is adopted by the issuer, it becomes the issuer's statement. Only an issuer can make the statement. Yes, it's not attributable, at least publicly, to JCM. Is there an alternate theory that JCM is really the day-to-day managers in day-to-day active control of the fund, and therefore it should be chargeable as if it and the fund are the same for purposes of making the statement? Your Honor. And we would say that's different from, say, an outside law firm or an auditor. Your Honor, the word control appears more than a hundred times in the briefs on the plaintiff's side of this case in this Court. And the Congress has dealt with control. Section 20A provides a separate cause of action against those who control another entity. Except that I, as I read your brief, and you can correct me if I'm wrong, you were arguing that because there was an independent board of directors, presumably because there are two corporate, different corporate funds, two different corporate forms, that there couldn't be controlled person liability under 20A. You seem that, I thought reading your brief, that's what you were alleging. So you can't have your cake and eat it, too. Either the independence of the board makes no difference or it does. So which is your position? Our position, Your Honor, is that the Congress has dealt with the situation where you have two separate companies, and to make a claim against the second company, you have to prove control. Whether or not they could in this case, none of us knows, because they never brought that claim. They represented the district court. Sotomayor, under what theory would you defend an allegation that the investment manager who had control over the everyday affairs of the company drafted or helped draft the perspective, hired the lawyers who helped draft it, wouldn't be a control person liability? How would you defend that? Your Honor, the investment company, the mutual funds, are separately owned, separately governed. Exactly. So you're – if they can't be control persons because they're separate companies, then how do they escape being primary violators? Well, Your Honor, then we're just saying that the investment advisor is a service provider like every other service provider. But it's not in this case, because the allegation is that it, not the company, that it chose to deceive the market. Your Honor, with respect, the allegation is that the advisor wrote a certain policy, but the very document cited for that in the complaint says that the trustees are responsible for the policies of the funds. The trustees, when they adopt them, it becomes the corporate policies of them. I mean, on the plaintiff's case the fund has employees. Yes, Your Honor. Who are the fund's employees? Are the officers of the funds, the chief executive officer, the chief of the cluster. And are all of those people also employees of JCM? Not the President, Your Honor, but the others are joint – serve in joint capacities. And could you just run through a little bit how one of these prospectuses gets issued eventually? The JCM lawyers start the process by drafting, and then what happens? The lawyers representing the trusts, both in-house and external, draft the underlying document. Well, here I believe that there was a statement in your interrogatories that it's JCM's lawyers, in-house lawyers, who drafted the relevant statements. The particular prospectus answered in that prospectus. That's exactly right. And then what happened? They are presented to the board of trustees, which holds a meeting. The board of trustees is represented. The funds are represented by outside counsel and the independent trustees are represented by outside counsel. And was there any change to these statements made by the board of trustees? These particular statements? Yes. Yes, Your Honor. There were changes to the market timing policy throughout the class period. In fact, earlier in the class period there was an express disclosure that market timing might be permitted pursuant to a written contract. That was revised later. The trustees asked multiple questions. There were back and forth with their lawyers. Outside counsel was always involved. And there are other consultants involved periodically as well. Would the outside counsel you are talking about represent the fund only? There is two separate sets of outside counsel. One law firm represents only the fund, does not represent the advisor, only represents the funds, Your Honor. There is a second law firm in this case that represents the independent trustees. Six of the seven trustees determined that to secure their independence, because the chairman of the board at that time was an interested person under the statute, they have a separate law firm. So there are two law firms that have nothing to do with the advisor. But the law firm that the lawyers who drafted the prospectus were in-house counsel for JCM on JCM's payroll. They were paid by JCM and at the time they drafted it they were representing the funds. Again, as allowed by the SEC, as disclosed. But there weren't these independent outside lawyers who were representing the board or the funds. They were the in-house counsel. Those outside counsel reviewed every policy. And in fact, if you look at the piece of the law. I guess my question was simply, the drafters of the prospectus were the in-house counsel for JCM. The paragraph being challenged in this case, that's correct, Your Honor, the interrogatory response doesn't speak more broadly than that, but I agree with that. Roberts I suppose if the lawyers for the trust did an inadequate job of reviewing the JCM drafts, they would be subject to malpractice action by the trust? Carvin Correct, Your Honor. And then the trust, of course, has contractual and other rights against the advisor that it has enforced, you know, in this very case, that the trustees made a claim against the advisor for all of this underlying conduct. Breyer What happens if the president of the oil company, knowing that the statement is false, says we have discovered 42 trillion barrels of oil in Yucatan, he writes it on a piece of paper, he gives it to the board of trustees, they think it's true and they issue it, Joe Smith buys stock and later loses money. Can Joe Smith sue the president of Yucatan, of the oil company, for having made an untrue statement of material fact? Carvin If he's an authorized agent of the same company that issued the statement? Breyer What he is, is he didn't issue it. What he did was he gave it to the board of trustees who issued it. Carvin If the board of trustees of his company, so that the statement is true. Breyer He's the president of the company. Carvin And the distinction here, Justice Breyer, is that the board of trustees issued it. Breyer No, no, I'm asking what happens. Is there recovery? Carvin If he is an authorized agent, he may be sued. Breyer He is running the business, the daily affairs of the company. Of course the president of a company is an authorized agent of the company. So, yes. Carvin He may be subject to liability. Breyer All right. Now, if he's subject to liability, why isn't your client subject to liability, who, after all, run every affair of the fund? Carvin Your Honor, they run the management of the fund, the investment of the fund. Breyer That's what a president does. The president of a company manages the company. And if the president is liable, why isn't the group of people who do everything for the company, why aren't they liable? Carvin Because, Your Honor, the corporate form has meaning in the Federal law and in State law, and where. Breyer You have to explain it to me more. I'm not being difficult. I understand this less well than you think I do. Carvin Justice Breyer. Breyer And I want to know. That's an obvious, naive question. And I'd like an answer that anyone could understand. Carvin The answer is, Your Honor, these funds are managed, governed, excuse me, is a better word, by the trustees. That is disclosed in these documents. In fact, the documents say, it's at page 258A of the Joint Appendix, the trustees are responsible for all the policies. They have outsourced, if you will, certain functions, operational functions, which stock to buy, which stock to sell, which transfer agent to hire. Those are functions that could be kept in-house or could be outsourced. Breyer I get it. In other words, you're saying on the papers here, it's the trustees that manage everything. Carvin That govern everything. Breyer That govern everything. And these are like helpers. Carvin Well, there are. Breyer They do a lot as helpers. Now, let me suggest to you that's one possible distinction. What about this distinction, that the managers of a fund, even though they are outsourced people brought in, are liable as principals, not aiders or abettors, if, following the criminal law here, if they are principals, if they get the false statement to the public through a conduit, the conduit being an entity or person that is unaware of the falsity of the statement? That's Lefebvre on criminal law. What about that? Breyer Three answers. First, that's dealt with in Section 20B, which is the ventriloquist dummy statute that these plaintiffs didn't invoke. Second, the Congress looked at this very question in 1938 and 1939 when there were proposals to merge the management, the advisor function with the funds, to make them one unitary entity. And in the Investment Company Act of 1940 and the Investment Advisors Act of 1940, the Congress elected not to do that. As this Court has recognized, it chose not to require compulsorily internalization of the management function. It allowed this separate entity. And therefore, when you have separate companies, under State law, again, my client is a Delaware limited liability corporation. The funds are Massachusetts Business Trust. They have nothing in common. There's no joint ownership, no joint governance. Could you? Sotomayor, you're not suggesting, are you, that they did this for purposes of protecting your client from a lawsuit? Absolutely not. No. They did it for a business reason, that having separate entities was economically more useful for the market, correct? And every fund, or virtually every fund in the United States is set up this way. And again, my third answer is that extensive regulatory involvement in the two acts enacted in 1940 specifically to regulate this industry, the Congress never made the decision to hold the advisor liable for the fund's conduct. In fact, no statute says that, and the SEC has never taken that position. There is no case cited in any of the briefs. They have 234 pages, 138 cases. Not one holds an investment advisor liable for statements in the fund's perspective. Kennedy, just to clarify Justice Breyer's hypothetical. In your — in the hypothetical you gave where the President gives an innocent board of directors false information and the prospectus goes out, is the company liable because their agent — is the company liable under 10b-5? The company may be sued under 10b-5, and he's going to have to meet all the elements. But, yes, if it's an authorized agent making a statement on behalf of the company. Which proves in— Kennedy, so what you're saying is that the agency relation that the President of the company holds is different than the agency relation that JCM holds? Absolutely right, Your Honor, and that's a distinction. Why is that? It's grounded in State law and the difference between one company and two companies, where Congress has looked at issuers. For example— Scalia, well, but is JCM an agent? Are you acknowledging that they're an agent of the fund? You know, for certain purposes, Justice Scalia, they are an agent. What purpose is it for purposes of — at issue here? No, Your Honor, not for drafting the prospectus, for carrying out the investment function. They are laid out in the contract. It's attached as an appendix to our brief, which sets forth the things that JCM is an agent for investment operations, not an agent specifically for registering the fund's securities for sales, complying with the Federal securities laws, preparing and issuing the prospectus, all those things by Congress. So even though they did those things, they acted in excess of their authority? They did not do those things, Your Honor. But that's the allegation. No, it's not the allegation. Well, suppose it were proven that they did do those things. Suppose it were proven that they did 100 percent of the prospectus work. The only thing that the fund did was to mail it. I don't know how to respond to that, Justice Kennedy, since it's so far beyond what they could possibly prove here. What happened here? Well, this case went off on the district court. Was it 12B6? Yes, Your Honor. Okay. And all that the Fourth Circuit said is it goes beyond, it has to go further. And the impression that I got from the Fourth Circuit's opinion is, and it could be reduced to a very simple statement, they said JCM was in the driver's seat. It was running this show. And if that can be proved, they thought that they would have a good case under JCM. And, Your Honor, no court, no case from this Court or any court of appeals has ever held that the driver's seat exception to central bank exists, and that is an expansion. The second issue in the case, of course, which is attribution, even if there is making by JCM, none of these statements were attributed to JCM.  Ginsburg. I mean, the Fourth Circuit, you started out with a statement that sounded like the sky is falling because lawyers would no longer be safe, banks would no longer be safe, but the Fourth Circuit's was a much narrower view. Its view was this JCM was the manager, it was controlling everything. Justice Ginsburg, the Fourth Circuit's view was the manager helped the funds. That no one even defends the Fourth Circuit's ruling. The government now comes in with a theory that they admit on page 22 of the government's brief does apply to every lawyer, every accountant, every lawyer. Scalia, I thought that the question on which we granted cert is very clear, whether the Fourth Circuit erred in concluding that a service provider can be held primarily liable in a private securities fraud action for, quote, helping, close quote, or, quote, participating in, close quote, another company's misstatements. Is that an accurate description of the Court's holding? It was not objected to by the Respondent here. Absolutely, Justice Scalia, and that question can only be answered. And that's what I thought we had granted. We weren't talking about control here. That was not the issue, I thought. We agree with the Court. The question presented can only be answered one way, the court of appeals erred. If I may reserve my remaining time. Thank you, counsel. Mr. Frederick. Thank you, Mr. Chief Justice, and may it please the Court. Mr. Frederick, is that an accurate description of the question before us? I don't think it is, Justice Scalia. Why didn't you object to it in your proposition? We did object to it in the sense that we described the complaints allegations as JCM writing and preparing and being responsible for the prospectus. And the question now we don't re-evaluate facts. We review the holding of a lower court. Now, is this an accurate description of the holding of the Fourth Circuit? And if it wasn't, why didn't you say that in your brief in opposition? We did say it in our brief in opposition, Justice Scalia, and the Solicitor General, when you called for the views of the Solicitor General, also said in the invitation brief that this case was not an appropriate vehicle for deciding just simply help and participate, because what the Fourth Circuit was saying in other parts of its opinion was that JCM was responsible for the prospectuses in all their various aspects, in writing, preparing, et cetera. And so we submit that for the reasons we stated in our opposition and we've stated in our red brief, as the case comes to this Court on reviewing a motion to dismiss of a complaint's well-pleaded allegations, and I can go through the complaint's allegations, if you like, that explain how JCM wrote and prepared the prospectus and the policies for the funds and then implemented them falsely, we would submit this case is not about service providers, but it is about Janus Capital Management being the primary violator. They were the ones who had the motive to lie, they had the incentive to lie, and they did lie. I'm sorry, Justice Scalia. Scalia Didn't they make the statements? Isn't that the statutory text that we're dealing with? Frederick, yes, they did. They did make the statements? Yes, they composed and created. It didn't go out under their name. It did. If someone writes a speech for me, one can say he drafted the speech, but I make the speech. Justice Scalia, we address the definition of make under the SEC's interpretation which is entitled to deference as being to create or to compose or to accept as one's own.  That's not what we're talking about. It depends on the context of make. If you're talking about making heaven and earth, yes, that means to create. But if you're talking about making a representation, that means presenting the representation to someone. I'm not drafting it for someone else to make. In the prospectus, there is a section on management that explains that Janus Capital management engages in the day-to-day functions. There are no employees of Janus Funds themselves. All of this is outsourced management. Except when they review material going in the prospectus. Then they have independent representation by outside counsel. What they don't have, Mr. Chief Justice, and where the falsity is here, is the ability of any of those outsiders to determine whether or not implementing the policy will be done fraudulently. And that's where the culpability is here. JCM runs these funds, and although the statement might be accepted by the board of trustees. Roberts. I don't understand your answer. The outside counsel reviews what the policy is going to be. Yes. Our question is the validity of that statement, whether that's deceptive in the prospectus. That seems to me to be an entirely different question. I understood your theory of the case to be that JCM is liable basically because they put it in the prospectus. And what they did was to falsely represent what they would do with that statement. I would direct the Court to paragraph 5. Well, that's the question, I guess. Your response seems to beg the question, is that they falsely represented. The issue is whether or not something happened between their drafting and its appearance in the prospectus that makes it appropriate to say that that's a statement of the trust rather than a statement of JCM. It is a statement of both in the sense that the fund is attracting investors, but the fund is managed and controlled by the investment manager here, JCM. But if JCM falsely represented what it would do, it made that false representation to the fund, and the fund, as has been acknowledged, would have a cause of action against JCM. That's not what's going on here. No. In fact, paragraph 5 of the complaint says that Janus is representing that its mutual funds, Janus Capital Management, its mutual funds were designed to be long-term investments. It then says in paragraph 6, So if you read the prospectus and you read the complaint, it is absolutely clear what Janus Capital Management is telling all the mutual fund investors of the world, if you invest in Janus, you will protect the long-term investments. Scalia, What is clear from all of those things is that JCM made any representation to the public. The representation was made in the prospectus issued by the fund, not by JCM. Now, the fund may have a cause of action against JCM, but what's crucial here is whether you can establish that it is JCM who made the representation to the public. And I don't see how you can get there. You might proceed under the control provision, but not by saying that they made the representation. Justice Scalia, they wrote the prospectus. Scalia, Just like writing a speech for somebody. And when they issued the prospectus, they used their address and represented to the public that they. Scalia, I'm sorry to interrupt, but it seems to be an important thing. When they issued the prospectus, who issued the prospectus? JCM filed it and disseminated it on its website, and all investors in the Janus funds knew to make inquiries to the manager if they had any question about the fund. Scalia, if I carry a letter over and file it on behalf of some principal, does it become my letter? Have I made that representation? Sure, they filed it. What does that prove? Because it's their own. As you say, they have no other agents, unless the trustees themselves were going to walk over and file it. JCM was functioning in that capacity as an employee of the fund in the filing. They didn't file it on their own behalf. Yes, they did. On their own behalf? Absolutely. They created the fund, Justice Scalia. That's how mutual funds work. Managers create them. They lure investors to them. They get money by having percentage of assets under management. And the SEC has recognized that they remain two separate entities, despite this interconnected relationship. Certainly. But there are many cases, in fact, I don't think it's ever been disputed in the courts of appeals, that if one company outsources its management function and those outsourced managers make lies on behalf of the company, they are also lenders to the company. One activity that we know they did not outsource was review of the material submitted by JCM. They had independent counsel that conducted that review. Would it have been a breach of the trustees' fiduciary obligations to the fund investors under common law, I forget where this is incorporated, to rubber stamp what they get from somebody on the outside, not to have independent counsel review what they're going to say in their prospectus? Mr. Chief Justice, my answer to your question is that's actually a very difficult question under fiduciary duty law, because here the fiduciaries have been duped themselves. They, when they got the wording of the prospectus and the policy that JCM was purporting to implement, JCM didn't tell the Board that there are 12 secret deals with hedge firm investors and a fund with short-term market dealers. Roberts, isn't that, again, what has been conceded, that there may well be an action from the fund represented by their trustees? Roberts, a common law suit for duping. Justice Scalia, in no instance that I'm aware of where a mutual fund investment advisor is a publicly traded company, would that cause of action run on behalf of the manager's shareholders? What we're talking about here is a company with a product, and they lie about the product. And in that instance, it's no different from the Vioxx case last year with Merck, or the difference from the Cold Remedy case you're going to hear argument in next term. The mutual funds happen to be the product of the company. They make misstatements about the product, and that's why they lie about the product. Alitos, this case didn't involve a mutual fund. Suppose it involved a corporation with thousands of employees, and the prospectus is drafted by outside counsel. It's adopted by the directors of the company without changing a word. Now, would that case come out the same? And if not, what would what exactly would you have us say to distinguish the two? Well, the outside lawyers I think are distinguishable in a number of different ways. One is that they are reacting on information provided by the company. That information is typically not subject to an independent investigation by outside counsel to determine the truth of harassment. Alitos, what if it's alleged that they knew exactly what was going on? If there is seientur, where the lawyers knowingly act in a way that helps or that contributes to that fraud, they may well be subject as aiders and abettors. It depends on whether you can establish that the lawyers have met all of the elements. I mean, you'd have to show reliance, you'd have to show loss causation, you'd have to show the primary violation on the part of the lawyers. Alitos, they would be liable as aiders and abettors. I thought there wasn't aiding and abetting liability. Sorry. The SEC would be able to proceed against the lawyers for aiding and abetting. Whether or not there would be a private action would depend on whether the lawyers – it could be pleaded under the heightened pleading requirements that they had met all of the elements of the 10b-5 claim. I would submit that's extremely difficult. What is it that – I'm unclear on this. That's why I use the oil company example. Plain, ordinary – the top executives in the oil company write the false statement, they give it to a board that doesn't know it's false, and the board puts it out in its name. Now, it seems to me it ought to be clear at this point in securities law whether those, the President and Vice President, are or are not liable under this 10b, the b part. Yes. And we cited those cases, I believe, at page 37.  You're saying they are liable. At page 37. But then their response to that is, this is not like the President of the oil company. And the reason that it's not is something to do with the nature of the obligation that runs between the managers and the fund, which is somehow different between the – you understand it better than I. Can you say what it is and what you think your response is? Yes. What I will say is that they don't have a principal distinction between those two situations. Simply having a contract to outsource management where those management functions of the company are resulting in false statements issued by the company shouldn't make very much sense. All right. So you're saying, you're saying, you're saying it shouldn't matter if they – it's worse if they run the whole company than if they're just the President. That's correct. All right. Now, at that point we get into a problem, and the problem is how do we distinguish an aid or a better from a principal? An aid or a better. And at that point I am uncertain indeed, and that's why I put out this for clarification or comment, this suggestion that you follow criminal law here and say at least they're a principal if they have a high position, they participate in it, they do all these things you say, and the entity that they're fooling in the first instance is simply a conduit, and therefore you cannot say it's a scheme because this other part of the scheme wasn't part of it. Well, to be a primary violator, you have to have met all of the elements of the cause of action. No. To be an aid or an abetter for enforcement purposes, SEC purposes, you simply have to provide substantial assistance to one who is a primary violator. Well, what's the difference between substantial assistance and doing it? You would not have to make the statement. You would do something to assist the person making the statement. Mr. Frederick, I thought we had held – I'm sure we had held there is no aiding and abetting liability. Yes. I'm not saying you can't. He's saying the distinction. You wanted to say what the distinction is, so I would, consistent with the view there is no aiding and abetting liability, you still would win your case. That's correct, because there is no primary violator under JCM's view of the facts here. They are the primary violator under our view of the facts here because they met all of the elements of the 10b-5 action and they had a motive to do it. Sotomayor, is your claim premised on Janus being duped or not? If Janus was not duped, if its board knew and JCM was doing the activity with either the consent or acquiescence of the board, would you have a claim here? We would. It would be somewhat different because we would plead multiple violators as the court in Central Bank and in Stone. Then go back to Justice Breyer's question, because I can see when there is one primary violator who uses another entity as a dupe or as a puppet, but I can't and I don't know how to distinguish what you are proposing from aiding and abetting. There has to be something to differentiate the two, so what is it? Failure on the part of the person who would not have met all of the elements of the 10b-5 claim, you have to have someone, two people, okay, both of them have to have satisfied all of the elements of a 10b-5 claim to be primary violators. If there is one element that is not satisfied with respect to that person, that person is only an aider and abetter and not subject to private remedies under section 10b, they would be subject to aiding and abetting liability under the SEC's. Alito But the distinction you are drawing is between making the statement and assisting in making the statement. Isn't that what you just said? Well, no, in the sense that we believe and we assert in the complaint and the complaint is adequately pleaded is that JCM made the statements.  Alito As in something you want to take place, right? So what is the difference, the distinction in this context? One possible distinction is who formally makes it and whose name is it made, but that's obviously not your position. So what is it to distinguish a principal here from an aider and abetter? Who has substantive control over the content of the message? That kind of substantive control, as the Court in the Utah Ten Commandments case pointed out, the government can have speech attributed to it on the basis of it putting up a monument on public land. There can be multiple speakers with respect to one message, and the question of how much substantive control you attribute to a particular speaker, we believe is the appropriate way to view the case. Scalia Do you deny that the Fund had substantive control? Couldn't the Fund have stopped this statement from being placed in its prospectus? Didn't it have outside lawyers who advised it whether it should allow this statement to be included in its prospectus? How can you say that they didn't have control? Well, they did not have a knowledge of the falsity of those statements. Well, that may seem that they are duped, but it doesn't mean that they don't have control. They had control, but you say they were duped. But that's quite a different theory from saying that they had control, that they didn't have control. No, Justice Scalia, they didn't have substantive control over the content of the message, because if they did, they would not have allowed these false statements to have been issued. And that's the whole point. That's the whole theory here. JCM was luring long-term investors with the promise, if you park your money with the Janus Funds, it will be safe from the kinds of market timing problems. They were then secretly going out and luring money from the hedge funds to allow them to make short changes. Kennedy, I'm sorry, but I'm not sure that that statement was attributed to JCM. The public understood it that way. You can play with the words make as you choose, but do we take the case on the assumption that you can show that it was attributed to JCM? I see nothing in the record that would justify that. Well, JA275A, Justice Kennedy, excuse me, says that Janus Capital Management reserved the Janus name for itself. How did it reserve that? You said twice in your brief that Janus is a name to which JCM reserves the right. How did it reserve the right? It said, and this is at page 275A, if for some reason Janus Capital Management's contract is terminated, the funds can no longer use the Janus name. They were intending to trademark and get the name out there to attract investors to the investment advisor's method of investing. And it was that type of usage that brought all of this together. The fund and the management, they are in function essentially one entity. The fact that they've contractually outsourced the management function should not alleviate the securities fraud that is alleged here. Kagan. But substantial part of the power of your argument comes from this notion, as Justice Ginsburg said, that JCM was in the driver's seat, that JCM had control, that they were — Janus was at most an alter ego of JCM, and maybe something more, that it was just a creature of JCM. But the securities legislation seems to deal with that in Section 20. In your case, it's not brought under Section 20. And because of the relationship between mutual funds and their investment advisors, presumably could not be brought under Section 20. So why should we think relevant the kind of control relationship that you're talking about? Because you don't want to create a road map for other people to commit fraud, Justice Kagan. And that's what their theory does. What their theory does is it says if we set up shell companies or if we dupe people to make statements, we can commit securities fraud with impunity, because we won't be held liable to having made the statement, even though we wrote it, we had substantive control over it, et cetera. Except to the SEC, right? Because they can pursue it under aiding and abetting. It's kind of a big problem if you're trying to say we're safe from actions for security fraud. Well, Chief Justice Roberts, this Court on numerous occasions has said that the private securities action is a complement to the enforcement efforts of the SEC, and in this instance, the shareholders of the investment manager. Well, I know, but you were just responding by saying the problem is that this will give people a road map. But they're going to hit a pretty big bump in the road when the SEC brings an action against them, including potential criminal actions. But, no, the problem, Mr. Chief Justice, is that under their construction of the facts, there's no primary violator. Mr. Perry said this morning there's no primary violator. And so if there's no primary violator, there can be no controlled person and there can be no aiding and abetting. Roberts. Thank you, Mr. Frederick. Mr. Gannon. Mr. Chief Justice, and may it please the Court. Petition. Sotomayor, you start by taking your brief and distilling it down to three sentences. Define what a primary violator is, what a secondary violator is, who aids and abets, and who a controlled person is, and then tell me how that definition would exclude lawyers, auditors, investment, general investment advisors, et cetera. I've read your brief, but I've been trying to distill it down to three sentences. So try to do that for me. A primary violator must be somebody who has actually committed all the elements of a 10b-5 contract. Give me an example of that. What do you see as all of the elements? Well, the elements for the private cause of action are the ones that this Court has repeated. They're risk-taking and unpaid. I understand, but. In this case, the key one that we're talking about is that you would need to be an actual maker of the statement. And that becomes, how is that different from aiding and abetting the making of a statement? We think that somebody can make a statement if they create the statement, and the statute and the rule both expressly apply to those who make statements directly or indirectly. But that's every lawyer who writes the false statement knowing it's false. So are you saying that every lawyer who writes the statement knowing it's false is a primary? Sienter is another element. And so a lawyer who just reviews the policy, JCM in this case, when JCM submitted false statements to the funds, if the funds were unaware, this is where Mr. Frederick concluded for the Chief Justice, that if there — if the person who actually releases the statement to the world has been duped and doesn't have Sienter, then there is — they are not going to be a primary violator. So just to get back, so you are conceding that if you lose this case, you will be unable to bring any aiding and abetting case in a situation such as this? Under Sections 20 — it depends on what the situation is. It seems like a yes-or-no question. Yes, if the situation here is one in which the funds ultimately cannot be proved to have had Sienter. If they did not know about the falsity of the statements in the prospectuses that they released to the public, then there would not be a primary violator. Under Section 20e for aiding and abetting liability, the commission can bring an aiding and abetting claim against somebody who provides substantial assistance, recklessly or knowingly — recklessly or knowingly provides substantial assistance to a primary violator, but the Court has repeatedly made clear that a primary violator needs to have violated all of the elements of a 10b-5 cause of action. Alito, I'm still not clear what your distinction is between making the statement and aiding and abetting in the making of the statement. Now, could you explain that? Is it necessary that the person in whose — the entity in whose name the statement is made is an empty shell? It's simply a puppet that's controlled by somebody else? Is that necessary, or does it go beyond that? No, I don't think that that's necessary. If the position that the commission has taken is that somebody makes a statement if he writes the statement or provides the false information that's used to construct the statement or allows the statement to be attributed to him, and we think that that's a reasonable construction of the term make, because the statute and the rule both apply to persons who make a statement directly or indirectly, and so they could be using a conduit, whether the conduit is witting or unwitting, they would be a primary violator if they had to. Scalia, is it a reasonable interpretation of make a statement indirectly? I mean, you can make it indirectly by not issuing it yourself, but having somebody else make it in your name. But I would not say that I'm making a speech indirectly if I've drafted the speech. The person for whom I drafted the speech is making the speech. Well, that may be true in the case of a speech, Justice Scalia, but in a classic boiler room situation where somebody's written the scripts for salespersons to use in order to make calls to sell stocks, the person who actually writes the scripts may never speak the words to a customer, he may never have his own name spoken on the phone, and therefore, the statements have not been attributed to him. Breyer. Some poor associate, his first day at work, the law firm sent him over there, and there he got stuck down in the boiler room. And somebody said, why don't you go write something that will get everybody to sell things, and why don't you say we're 1,000 tons of oil instead of only a ton. There he is, he writes it out. You think he's liable? If he writes it out and he doesn't know, he obviously is liable because he doesn't have the answer. No, no, he knows. You know, at some level he knows. I shouldn't be saying they found 1,000 tons of oil when they only found 50, okay? And four people told him to go do something like that. But he's the guy who wrote it. I'd say he didn't behave well, but I don't think he's the principal. In that instance, because he was acting specifically at the direction of security. Breyer, let's say what words to write that gave him the general idea, and then he did it. He created the words, to use your phrase. When you say creating the words, he's a great writer. We do on page 22 acknowledge that somebody needs to be sufficiently involved in the creation or dissemination of the statement in order to be deemed its maker or its author. Ah, now we have sufficiently involved. Once we're into sufficiently involved, we're back into what is sufficient to make the person the principal rather than the aider and the abetter, and apparently creating or writing the statement is not clear whether it is or is not sufficient, so we're back into the problem. In this instance, there's no doubt that the manager of the funds was not a mere advisor. They bodily wrote the statement. I'm interested in your test. I'm interested in your test, not the. Well, the test does acknowledge that if there is not sufficient control over the content of the message and the dissemination of it, that somebody may be more in an advisory capacity. That might be the instance with lots of outside law firms when they're acting at the specific direction of counsel. That's not the situation of. Ginsburg. In that connection, Mr. Gannon, would you answer the statement that Mr. Perry made, that the government had in fact conceded that this theory would spread not only to the investment advisor, so closely linked to funds, but to every lawyer, every accountant, every bank. You said that on page something. We said that he was referring to the statement on page 22 of the government's brief, referring to the need for the author to be sufficiently involved in creating or disseminating the statement. And I think it's very important to recognize that scientere is an important limiting principle for the 10b-5 cause of action. Scalia, which requires it to be alleged with particularity, there need to be facts sufficient to give rise to a strong inference that the defendant acted with scientere, and there are penalties beyond Rule 11 that are imposed if the plaintiff is not in   is mistaken in doing so. Kennedy, you think attribution to the actor is not necessary for the actor's liability for a statement? That's correct. We think that any other rule would immunize falsely attributed or anonymous statements. And if the whole purpose of a fraud was to convince somebody that this statement came from Warren Buffett so that I could turn a quick buck before the market realized that it wasn't actually from Warren Buffett, the fact that it was not attributed to me would not change the fact that I had made the statement and that the market had relied upon it. The truth is that reasonable investors, and that's the test for purposes of reliance, can rely on anonymous and falsely attributed statements. In this instance, there is no reason to doubt that an investor would have relied on statements in the prospectus about the fund's purported anti-market timing and excessive trading policies. And so we think that in general there doesn't need to be an attribution requirement. But in this instance, it's quite clear that a reasonable investor could have relied on statements in the prospectus. Sotomayor, you just admitted if the company was due, you couldn't have aiding and abetting liability. Could you impose a 20A or 20B control person liability? The control person liability also needs to have a primary violator under the terms of 20A. Sotomayor, we think that the test that the SEC is using and that you recite on page 13 is really pretty broad, and that it might apply to a range of factual situations that are not before us. Is there a way to confine our holding just to the mutual fund situation? And if there is, how would you do that? Well, I think the easiest way would be to analogize it to the cases involving corporate employees. As Petitioners acknowledge, there are cases where a corporate employee drafts a statement that's issued in the company's name. In this instance, the investment advisor is management for the company. And the fact that they happen to be management by virtue of contract rather than just the internal arrangements of the corporation shouldn't change that arrangement. It's also the case that if the Court were looking for a way to narrow its holding, it could do so by talking about the elements of the 10b-5 cause of action, which would apply only to private suits and not to enforcement actions brought by the commission or by the Department of Justice. Scalia, it should change that, because Congress has made it very clear that investment advisors are not to be treated like employees. You want us to undo a clear distinction that Congress has made. Well, the statute says that somebody, any person, makes the false statement directly or indirectly. And in this instance, the SEC got a cease and desist order that's reprinted at page 407 in the Joint Appendix that was predicated on a provision of the investment company act, section 34b, that tracks 10b and makes it unlawful for any person to make any untrue statement of material facts. And the commission believed that they were chargeable with that violation. Roberts. Thank you, Mr. Gannon. Mr. Perry, you have 4 minutes remaining. Justice Kennedy, in response to your attribution question, Mr. Gannon said something about falsely attributed or anonymous statements. We have neither here. We have a correctly attributed, non-anonymous prospectus that under Federal law says on the first page of the document who it's attributed to, the Janus Funds, who have their own trustees. Justice Ginsburg, who's in the driver's seat? Page 258A of the Joint Appendix. Quote, ''The trustees are responsible for major decisions relating to each fund's objectives, policies, and techniques. The trustees also supervise the operations of the fund by their officers and review the investment decisions of the officers.'' There is no misdirection here about who's in charge. The trustees are in charge. Ginsburg. But the whole arrangement was made possible by JCM. JCM wants long-term investors, so it puts this provision in prospectus. The board of directors has no reason to believe that JCM is dissembling and it's going to go out and seek hedge funds. If it is a dupe case, Justice Ginsburg and Justice Sotomayor, it's dealt with by 20b, which Mr. Gannon did not answer, you notice. 20b does not require a primary violation. It allows the commission to proceed directly against any person who acts indirectly where it can't act directly. So 20b answers this problem. The commission also, the 34b of the Investment Company Act is brought. There's also section 206 and 215 of the Investment Advisors Act, which regulate the conduct of investment advisors. Congress has dealt in a very reticulated way. And all of the questions today I would submit show the absence of bright lines being proposed by my friends on this side of the table. They can't articulate the distinction between primary and secondary, between principal and agent, between haters and abettors and anyone else. This is an area that needs bright lines, that needs to be resolved on motions to dismiss. Scienter can't be resolved on a motion to dismiss. And the Congress, in the Dodd-Frank Act, which the plaintiffs said in their opposition in this Court to this certiorari petition was going to solve the problem by enacting a new statute. It turns out Congress didn't enact that statute. Instead, Congress referred this issue to the General Accounting Office, to the Comptroller General, and said, take a year, take all the resources of the Federal Government, study the problem of the distinction between companies that issue securities on the one hand, the funds here, and those who provide services on the other hand, the advisor here, and tell us, come back to the Congress and tell us whether we need to solve the problem. Alito, just to sum up, if there are, if investors in a mutual fund are duped by a false statement that is made in fact, written by the management company and issued by the fund without knowledge of its falsity, is there any place they can get, look to for relief? The investors in the mutual fund, Justice Alito, got $100 million through the SEC action and resolved all the civil litigation. There are separate class of investors, whole different set of securities laws problem because they were the recipients of the prospectus that offered these securities and that contained the false statements. This plaintiff's fundamental problem, they didn't purchase or sell the securities that were offered by the prospectus they complained about. They can't find any false statements. Kagan. But, Mr. Perry, on the allegations of this complaint, these plaintiffs were harmed by the misrepresentations, the alleged misrepresentations from JCM to the fund. So if the fund was duped, would these shareholders, JCM's shareholders, have any relief? These shareholders, JCG's shareholders have no relief. And, Justice Kagan, I would point out that in the 70 years since the Investment Company Act was enacted and the modern mutual fund industry was built, I'm not aware of any case, and they certainly haven't cited one, in which the investors in the parent company have ever recovered a dime in an SEC action, in a private action or otherwise, for statements in the fund's prospectuses. There is a line between corporate entities and the liability runs up different channels. This is a totally novel, unprecedented theory that they're presenting. What was the theory of the fund shareholders? You said the fund shareholders recovered, there was a settlement. What was that action? Their theory was that there was an omission, that the advisor owed a duty to the fund. The statements were correct when made, Justice Ginsburg. There was no market timing. When the advisor later allowed certain traders in, it owed a duty to correct those statements in the prospectuses to the fund. That was the liability theory of the investors. These plaintiffs can't pursue that liability theory because the duty doesn't run the other way. It doesn't run from JCM to JCG's investors. That's the law of this case. And therefore, they can't bring an omissions case. They have to bring an affirmative misstatements case for statements that were not directed to this group of investors. Thank you, Mr. Perry. The case is submitted.